In the

# United States Court of Appeals
## For the Seventh Circuit
_____

No. 22-2922

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MONICA WRIGHT,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Central District of Illinois.
No. 20-cr-40003 — **Sara Darrow**, *Chief Judge.*

_____

ARGUED SEPTEMBER 13, 2023 — DECIDED NOVEMBER 1, 2023

_____

Before FLAUM, RIPPLE, and SCUDDER, *Circuit Judges.*

FLAUM, *Circuit Judge.* Drug dealers from the Quad Cities traveled to Colorado to buy kilos of meth from Monica Wright. After the dealers testified on behalf of the government, Wright was convicted of conspiring to distribute and possessing with intent to distribute methamphetamine. On appeal, Wright challenges what she characterizes as an actual conflict of interest with her attorney, as well as the sufficiency of the evidence underpinning her conspiracy conviction.

Because there was no conflict of interest and sufficient evidence of conspiracy, we affirm Wright's conviction.

## I. Background

Shawn Pfister and Cynthia Evans dealt methamphetamine in the Quad Cities.[1] In the summer of 2016, they learned of a new potential source: Colorado Springs resident, Monica Wright. In the weeks that followed, Pfister and Evans traveled to Colorado approximately twenty times to buy meth from Wright.

The first trip was in June 2016. Pfister, accompanied by Joey Deherrera—a Colorado-based middleman—went to Wright's home on Marilee Way and purchased just under one kilogram of meth. That cadence persisted, with Wright selling Pfister and Evans roughly one-to-two kilograms of meth per week for approximately seven-to-eight weeks. Deherrera accompanied Pfister and Evans on some of these trips and when he did, he received $500 from the total paid to Wright.

That summer, Pfister was arrested at a casino in Iowa. To help pay Pfister's bail, Evans, who was his on-again, off-again girlfriend, turned to Wright. Wright agreed to sell Evans meth and let Evans stay with her for several days while she sourced the meth. Drugs in hand, Evans returned to the Quad Cities where she sold about nine ounces to a local dealer, Regina Heavener.

---

[1] Because Wright challenges the sufficiency of the evidence, we relay the facts in the light most favorable to the government. *United States v. York*, 48 F.4th 494, 499 (7th Cir. 2022), *cert. denied*, 143 S. Ct. 1772 (2023).

Officers searched Heavener's home on September 13, 2016, and recovered over fifty grams of meth. Heavener knew that Evans got the meth from "Monica" in Colorado Springs. After learning of the drug bust (and posting bail), Pfister warned Wright that police might be following their activities.

At one point, Pfister was short on funds to pay for meth, but Wright nevertheless fronted him approximately eight ounces. To pay her back, Pfister gave Wright a stolen pull-behind trailer. On another occasion, Wright asked Pfister if he could get a gun for her meth source. Pfister gave Wright one that he had obtained by trading a vehicle.

Pfister and Wright also had several conversations about the business side of the operation. They discussed the cost of meth, how much Pfister was selling it for, his profits, and whether Wright could keep up with his demand. They also discussed how Wright's drug dealing was paying for rent at the Marilee Way house and for renovations at her house on Auburn Drive. Wright cautioned Pfister and Evans not to use phones to discuss their drug transactions, explaining that her ex-husband had been arrested on drug conspiracy charges after a wiretap was placed on his phone.

In October 2017, the Drug Enforcement Administration executed a search warrant at Wright's residence on Auburn Drive—not the Marilee Way address where Pfister and Evans purchased drugs. Agents did not recover drugs or drug paraphernalia during the search.[2]

---

[2] Wright testified at trial that she was renting out her Auburn Drive home and living with a roommate at the Marilee Way address at the time of the alleged conspiracy.

Wright was nevertheless charged by indictment with intent to distribute at least fifty grams of meth and at least 500 grams of a mixture containing meth. She was initially represented by a Federal Public Defender but ultimately retained Hal Garfinkel, who took the case to trial in June 2022.

In its opening statement, the government previewed testimony from Evans, Pfister, Heavener, and Deherrera. Garfinkle also foreshadowed testimony from Deherrera, referring to him as the government's witness. He told the jury that Deherrera would testify that he never saw Wright with large amounts of meth. Despite this potentially helpful testimony, Garfinkel never planned to call Deherrera, just cross-examine him.

The morning of the second day of trial, the government alerted the court to an issue that arose while prepping Deherrera the night before. Deherrera told the government that during a meeting a few months earlier, Garfinkel insinuated that Deherrera lied to the grand jury and encouraged him to change his testimony. The government referenced Deherrera's potentially exculpatory testimony but did not explain whether Deherrera had changed those aspects of his testimony. The government simply stated that it no longer planned to call him as a witness. As a result, it informed the court of a potential conflict: If Wright called Deherrera and he testified to being pressured to change his testimony, Garfinkel would have to take the stand to impeach him. Consequently, it was possible that Garfinkel's decision not to call Deherrera could be motivated by self-interest and in conflict with Wright's best interest.

During the colloquy with the court, Garfinkel vehemently denied Deherrera's allegations. He then said:

> So, now if the government doesn't call him—I have no idea what Mr. Deherrera is going to say. And if, in fact, he is going to get up on that stand and say that during our conversation or conversations that I made that insinuation, then asked him to change his testimony, I'm not calling him … .

> [T]he government's not going to call him. I'm not going to call him. It is an interesting issue if, in the event Ms. Wright is convicted, if she were to come back post-conviction and then say, well, I could have called Deherrera and I didn't, if that somehow, you know, becomes a *Strickland* argument. I don't know.

> I would think now if Mr. Deherrera is going to testify consistent with the interview last night, I can't imagine why Miss Wright would want him on the stand. I don't want him on the stand. I think at that point that vitiates any conflict.

The court directed Garfinkel to discuss the issue with Wright:

> I'm going to ask her about whether or not she — what she wants to do and whether or not her decision is knowingly [sic] and not forced and if she—it's not necessarily a waiver of a conflict because I don't know that there is a conflict, but I just want to explore that with her so it's on the record.

After a brief recess to allow Garfinkel and Wright to confer, the court questioned Wright. Wright confirmed she

understood and agreed with Garfinkel's strategy to not call Deherrera. She affirmed that she understood the possibility that Garfinkel was personally motivated not to call Deherrera. Nevertheless, she confirmed that she was "comfortable and confident that Mr. Garfinkel [was] making the decision … because [it was] not a good strategy for [her] defense."

No additional record was made, and Garfinkel continued representing Wright. At the close of the government's case-in-chief, Garfinkel made an oral motion for directed verdict, which the court denied.

Wright testified in her own defense. Wright explained that she and her boyfriend purchased meth in user amounts to share on a near-daily basis. As for her relationship with Pfister, Evans, and Deherrera, she testified that they came to her home infrequently to smoke meth with her. On those occasions, Pfister and Deherrera provided small amounts of meth and sometimes Wright would contribute some of her own to smoke communally.

Deherrera did not testify at trial, but references to him dominated Garfinkel's closing argument. Garfinkel argued that Deherrera "[was] the[ government's] case," "the seminal figure," and "the elephant in the room" was that he did not testify at trial. He described Deherrera's absence as the missing link—a burden the government had to overcome to convict Wright.

The jury nevertheless found Wright guilty on June 16, 2022. On July 10, 2022, Garfinkel filed a motion for leave to file a motion for a new trial instanter. Any motions for a new trial or for judgment of acquittal were due by June 30, 2022. Undeterred, on July 18, 2022, Garfinkel filed an amended

motion for leave to file a motion for a new trial, attributing the belated filing to a Covid exposure. At Wright's sentencing hearing on October 12, 2022, the court denied the motion for leave, finding no excusable neglect. Wright was then sentenced to 264 months in prison. Represented by new counsel, she timely appealed her conviction.

## II. Discussion

On appeal, Wright mounts a Sixth Amendment challenge. She argues that her constitutional right to conflict-free counsel was violated by Garfinkel's actual conflict of interest. She also challenges the sufficiency of the evidence supporting her conspiracy conviction, claiming that, at most, the evidence showed a buyer/seller relationship. We evaluate each challenge in turn.

### A. Sixth Amendment

The Sixth Amendment guarantees criminal defendants two, sometimes opposing, rights: (1) the right to choose their attorney (assuming they do not require appointed counsel), and (2) the right to effective assistance of counsel. *United States v. Turner*, 594 F.3d 946, 950 (7th Cir. 2010). "[W]here an actual conflict of interest or a serious potential for a conflict exists" between the attorney and her client, those rights are pitted against each other, and the right to select an attorney must give way. *United States v. Turner*, 651 F.3d 743, 749 (7th Cir. 2011); *Turner*, 594 F.3d at 948 (reversing the district court's disqualification of counsel explaining it "disregarded the presumption in favor of the defendant's chosen counsel"); *Wheat v. United States*, 486 U.S. 153, 164 (1988) (expounding upon the "presumption in favor of petitioner's counsel of choice," but explaining that "the presumption may be overcome … by a

demonstration of actual conflict" or "showing of a serious potential for conflict").

Wright challenges the district court's handling of the alleged conflict of interest between her and Garfinkel. According to Wright, after the government flagged the potential conflict, Garfinkel's on-the-record response should have alerted the district court to the existence of an actual conflict of interest. In that situation, Wright argues the district court is required to either appoint new counsel or obtain a valid waiver of the conflict.

At the outset we must acknowledge the district court's difficult position when facing a conflict-of-interest claim. "If the accused says he wants to be represented by a lawyer who faces an actual or potential conflict of interest, the district court can err in either direction: either deny the accused his choice of counsel or deny him counsel free of conflicts of interest." *United States v. Vizcarra-Millan*, 15 F.4th 473, 491–92 (7th Cir. 2021). Consequently, district courts "have broad discretion in how to handle this constitutional balancing act." *Id.* at 492.

Wright's argument finds the most support from case law addressing conflicts that arise in the joint-representation context. In those cases, Federal Rule of Criminal Procedure 44 requires the court to "promptly inquire about the propriety of joint representation and … personally advise each defendant of the right to … separate representation." Fed. R. Crim. P. 44(c)(2). Specifically, the district court has "the duty to inquire adequately into a trial counsel's conflict of interest if it knows or reasonably should know that a particular conflict exists." *United States v. Lafuente*, 426 F.3d 894, 897 (7th Cir. 2005) (quoting *Holleman v. Cotton*, 301 F.3d 737, 742 (7th Cir. 2002)).

No. 22-2922                                                              9

Otherwise, a judge's failure "to appoint separate counsel or to take adequate steps to ascertain whether the risk was too remote to warrant separate counsel" deprives the defendant of his Sixth Amendment right. *Holloway v. Arkansas*, 435 U.S. 475, 484 (1978). The only appropriate remedy in those cases is automatic reversal. *See id.* at 489; *see also Lafuente*, 426 F.3d at 897 (explaining in a joint-representation-conflict case, the defendant is entitled to "automatic reversal or a remand for an evidentiary hearing" under *Holloway*).

Wright would have us apply a similar principle to all conflicts and require the district court use standardized language to admonish the defendant of her Sixth Amendment right. But the Supreme Court has not extended the redress identified in *Holloway* to contexts other than joint representation. *Lafuente*, 426 F.3d at 897. As we explained in *Lafuente*, Supreme Court decisions in the wake of *Holloway* have limited its "holding to situations in which the district court requires joint representation over a timely objection." *Id.* The required procedure is elastic in cases like this one that fall outside that context. The district court "ha[s] discretion to determine what type of hearing [is] necessary to address [the defendant's] conflict of interest claim." *Id.* at 898.

"To establish a violation of [her] Sixth Amendment right to conflict-free counsel, [Wright] 'must demonstrate that an actual conflict of interest adversely affected h[er] lawyer's performance.'" *United States v. Lewisbey*, 843 F.3d 653, 657 (7th Cir. 2016) (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980)). The first step in doing so is "establish[ing] the existence of a conflict of interest" and the second is showing adverse effect. *United States v. Coscia*, 4 F.4th 454, 475 (7th Cir. 2021), *cert. denied*, 142 S. Ct. 1127 (2022); *see also United States v. Beck*, 718 F.

App'x 429, 432 (7th Cir. 2017) (applying standard where alleged conflict emanated from the government's concurrent federal criminal investigation of the defense attorney).

"An actual conflict exists if an attorney is torn between two different interests," *United States v. Holman*, 314 F.3d 837, 845 (7th Cir. 2002), or "required to make a choice advancing his own interests to the detriment of his client's interests," *Stoia v. United States*, 109 F.3d 392, 395 (7th Cir. 1997) (citation and internal quotation marks omitted).

There was no actual conflict of interest in this case. To start, neither the government nor Wright's attorney believed there was an actual conflict of interest. The government raised the issue on the second day of trial but framed it as a situation that "could potentially create a conflict" under certain, contingent circumstances. Garfinkel agreed that there was no conflict of interest. He somewhat obliquely explained, "[I]f Mr. Deherrera is going to testify consistent with the interview last night, I can't imagine why Miss Wright would want him on the stand. I don't want him on the stand. I think … that vitiates any conflict." *See Holleman*, 301 F.3d at 744 (describing reliance on representations made by counsel as reasonable given "presumption that attorneys make truthful representations to the court"); *United States v. Fish*, 34 F.3d 488, 493 (7th Cir. 1994) (explaining that the "attorney confronted with a potential conflict … is in the best position professionally and ethically to determine when a conflict of interest exists" (citation and internal quotation marks omitted)). While not calling Deherrera might be to his benefit, Garfinkel believed it was also in Wright's best interest. It is evident that the district court agreed. When questioning Wright about how she

wished to proceed, the court remarked, "[W]e're not really sure what [Deherrera] might testify to."

What the government, Garfinkel, and the trial court all seemed to understand—but Wright does not acknowledge on appeal—are the risks inherent in calling a witness who changed his story the night before testifying. This is true even if Deherrera could provide potentially helpful testimony to Wright's defense. Deherrera's testimony had suddenly changed in at least one respect—he belatedly accused Garfinkel of pressuring him to change his testimony. That made him an extremely risky witness.

The risks associated with calling Deherrera align Wright's interest with Garfinkel's alleged personal interests. There was no actual conflict of interest because he was not caught between "advancing his own interests to the detriment of [Wright's]." *Stoia*, 109 F.3d at 395 (citation and internal quotation marks omitted).

The risks associated with calling Deherrera also prevent Wright from proving that failing to call him had an adverse effect on her defense. *See Hall v. United States*, 371 F.3d 969, 974 (7th Cir. 2004); *see also United States v. Lake*, 308 F. App'x 6, 9 (7th Cir. 2009). "[I]t is significantly easier to demonstrate an 'adverse effect' than to show 'prejudice'"—the *Strickland* standard. *Stoia v. United States*, 22 F.3d 766, 771 (7th Cir. 1994). An attorney's performance is adversely affected if "there is a [reasonable] likelihood that" absent the conflict of interest "counsel's performance somehow would have been different." *Id.* (alteration in original) (citation and internal quotation marks omitted). This hypothetical different performance "must be a 'plausible alternative to the strategy actually pursued at trial.'" *Burkhart v. United States*, 27 F.4th 1289, 1295 (7th

Cir. 2022) (citation and internal quotation marks omitted), *cert. denied*, 143 S. Ct. 309 (2022). "There can be no 'reasonable likelihood' that counsel would have done something different … if the alternative defense strategy was implausible." *Id.* at 1296. After all, "the law does not require defense counsel to pursue hypothetical strategies with no on-the-ground plausibility in the realities of the prosecution facing a defendant." *Id.*

Because Garfinkel had good reason not to call Deherrera, Wright cannot show "a reasonable likelihood that his counsel's performance would have been different had there been no conflict of interest." *Hall*, 371 F.3d at 974. Even assuming Garfinkel was personally motivated not to call Deherrera, it is implausible to believe that he would not have reached the same decision if his singular focus had been Wright's best interest. As a consequence, Wright's Sixth Amendment claim fails.

## B. Sufficiency of the Evidence

Normally we review sufficiency challenges in the "light most favorable to the government," reversing "only if the fact finder's take on the evidence was wholly irrational." *United States v. Tinsley*, 62 F.4th 376, 386 (7th Cir. 2023) (citation and internal quotation marks omitted). To preserve a sufficiency challenge though, a defendant must make or renew her motion for judgment of acquittal either at the close of evidence or through a timely post-trial motion as specified by Federal Rule of Criminal Procedure 29. *See, e.g.*, *United States v. Pless*, 982 F.2d 1118, 1122 (7th Cir. 1992); *United States v. Fitzpatrick*, 32 F.4th 644, 647–49 (7th Cir. 2022) (reviewing sufficiency challenge in light most favorable to the government where defendant made and then renewed his motion for acquittal

after the close of evidence and in a post-trial motion); *see* Fed. R. Crim. P. 29(c)(1) ("A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later."). Where the defendant does not preserve her challenge, we review for plain error. *United States v. Beaver*, 515 F.3d 730, 741 (7th Cir. 2008).

When a sufficiency challenge is preserved, the hurdle is "nearly insurmountable," but the "hurdle is even higher" when it is not. *United States v. Lundberg*, 990 F.3d 1087, 1095 (7th Cir. 2021) (citation and internal quotation marks omitted). To reverse a jury verdict on plain error review, the record must be "devoid of evidence pointing to guilt." *Id.* (citation and internal quotation marks omitted). Put another way, we will reverse only if there was a "manifest miscarriage of justice." *United States v. Owens*, 301 F.3d 521, 528 (7th Cir. 2002).

We review Wright's challenge for plain error. While she made an oral motion for acquittal at the close of the government's case, she did not renew it at the close of evidence or through a timely post-trial motion. *See id.* at 527–28 ("[Defendant] did not preserve normal review of the issue because, although he moved for a judgment of acquittal at the close of the government's case, he failed to renew his motion at the close of all the evidence."); *United States v. Archambault*, 62 F.3d 995, 998 (7th Cir. 1995).

With the standard of review settled, we review the evidence to determine whether it is "clear or obvious … that there was insufficient evidence" to find Wright guilty; that is, whether "the record is devoid of evidence pointing to guilt, or if the evidence [of Wright's participation in a conspiracy]

was so tenuous that a conviction would be shocking." *United States v. Meadows*, 91 F.3d 851, 855 (7th Cir. 1996) (citation omitted).

Wright's argument for reversing her conviction is that the government failed to prove conspiracy, proving at most a buyer/seller relationship. To convict a defendant of conspiracy, the government must prove "(1) two or more people agreed to commit an unlawful act, and (2) the defendant knowingly and intentionally joined in the agreement." *United States v. Hidalgo-Sanchez*, 29 F.4th 915, 924 (7th Cir. 2022) (citation and internal quotation marks omitted), *cert. denied sub nom. Gomez v. United States*, 143 S. Ct. 385 (2022). For drug conspiracies like this one, the government must prove "the defendant knowingly agreed, perhaps implicitly, with someone else to distribute drugs." *Id.* at 924–25.

To determine if the government proved conspiracy, we must differentiate between evidence that supports the existence of a conspiracy and evidence that is merely indicative of a buyer/seller relationship. *Id.* If the evidence is "'in equipoise'—that is, it suggests that either [a conspiracy or buyer/seller relationship] is equally likely," it "is insufficient to prove a drug-distribution conspiracy." *Id.* at 925.

Some characteristics of a conspiracy include:

> sales on credit or consignment, an agreement to look for other customers, a payment of commission on sales, an indication that one party advised the other on the conduct of the other's business, or an agreement to warn of future threats to each other's business stemming from competitors or law enforcement authorities.

*Id.* (citation omitted). Still, our charge is to make a "holistic assessment" not limited to or confined by any factors. *Id.* Circumstantial evidence is sufficient to prove a conspiracy, but the government must present "evidence establishing an agreement to distribute drugs that is distinct from evidence of the agreement to complete the underlying drug deals." *United States v. Johnson*, 592 F.3d 749, 754–55 (7th Cir. 2010). With these principles in mind, in context of plain error review, it must be obvious that Wright only had a buyer/seller relationship with those who purchased meth from her; we must find the conviction "shocking." *Meadows*, 91 F.3d at 855.

Three categories of evidence tip the scale in this case. First is the sale of drugs on credit, repaid in part by a stolen pull-behind trailer. A single sale on credit is significant and may be evidence of conspiracy when coupled with other evidence. *Hidalgo-Sanchez*, 29 F.4th at 925; *Johnson*, 592 F.3d at 756 n.5. While "not all credit sales can support an inference that there was an agreement to distribute," if it "is coupled with certain characteristics inherent in an ongoing wholesale buyer-seller relationship … the credit sale becomes sufficient evidence to distinguish a conspiracy from a nonconspiratorial buyer-seller relationship." *Johnson*, 592 F.3d at 756 n.5. For example, "large quantities of drugs, [or] repeat purchases or some other enduring arrangement" is evidence of a conspiracy when coupled with a credit sale. *Id.* (citation and internal quotation marks omitted); *see also United States v. Moreno*, 922 F.3d 787, 794 (7th Cir. 2019) (noting that while "occasional sales on credit" "alone do not support an inference of conspiracy," when taken with other evidence it "can support a conspiracy finding" (citation and internal quotation marks omitted)). Here, in addition to the credit sale, there was significant evidence of repeated, distribution-quantity drug transactions

over a seven-to-eight-week period. *Moreno*, 922 F.3d at 794–95 (holding sufficient evidence supported conspiracy where evidence of credit sales was coupled with evidence of sales of "two to four kilograms of heroin … once or twice a month").

The second piece of evidence is the gun Pfister gave to Wright. It falls into a category we have frequently recognized as indicative of a conspiracy: "sharing tools and supplies." *Id.* at 794; *United States v. Foy*, 50 F.4th 616, 625 (7th Cir. 2022) (discussing evidence of sharing tools as support for conspiracy conviction), *cert. denied*, 143 S. Ct. 2660 (2023); *cf. United States v. Perez*, 581 F.3d 539, 547 (7th Cir. 2009) ("[W]eapons are recognized tools of the drug trade." (citation and internal quotation marks omitted)). Pfister provided a gun to Wright for her meth source to use to ensure the conspiracy continued. After all, if Wright's source was unable to defend his stash, the conspiracy would be imperiled. As such, the gun also supports Wright's conspiracy conviction. *See United States v. Bradford*, 905 F.3d 497, 506 (7th Cir. 2018) (describing evidence such as "the provision of tools to advance the distribution" as common evidence supporting the existence of a drug conspiracy (citation and internal quotation marks omitted)).

Third, and last, is Wright and Pfister warning each other about potential threats to the conspiracy. Wright warned Pfister and Evans not to discuss drug transactions over the phone out of concern for a federal wiretap. Similarly, Pfister warned Wright, after the drug bust at Heavener's home, that the authorities might be watching them. Both are examples of providing "warnings of threats by … law enforcement." *Moreno*, 922 F.3d at 794. Much like one-time sales on credit, singular warnings are insufficient to establish a conspiracy. *Johnson*, 592 F.3d at 757. However, these two warnings,

No. 22-2922                                                          17

coupled with the other evidence discussed, and in light of our plain error review, are sufficient to establish a conspiracy.[3] *Moreno*, 922 F.3d at 794; *United States v. Pulgar*, 789 F.3d 807, 815–16 (7th Cir. 2015).

### III. Conclusion

For the reasons explained, the judgment of the district court is AFFIRMED.

---

[3] Also evincing a conspiracy is Deherrera's participation as a middleman, receiving a cut of the money Pfister and Evans paid for the drugs. Recognized characteristics of conspiracy include "payment of commission on sales," *Hidalgo-Sanchez*, 29 F.4th at 925, and use of middlemen, *United States v. Cruse*, 805 F.3d 795, 812 (7th Cir. 2015) ("Cooperation with a middleman is a conspiracy per se because the dealer and the middleman have agreed to work together to distribute drugs to third parties.").